SYLVIA COAL COMPANY, INC., *A Corporation*

*v.*

MERCURY COAL & COKE COMPANY, *A Corporation*

(No. 12625)

Submitted May 9, 1967.    Decided July 11, 1967.

*Dailey, Halbritter & Smith, James T. Dailey, Jr.,* for appellant.

*Haden & Haden, Charles H. Haden, Charles H. Haden, II,* for appellee.

BERRY, JUDGE:

This is a civil action instituted in the Circuit Court of Preston County by the Sylvia Coal Company, Inc., hereinafter referred to as Sylvia or plaintiff, against the Mercury Coal & Coke Company, a Corporation, hereinafter referred to as Mercury or defendant, to recover the sum of $3,548.37 for 1419.35 tons of coal delivered by the plaintiff to the defendant at $2.50 per ton. The jury returned a verdict in favor of Sylvia in the amount of $1,000 and after the judgment was entered thereon by the trial court a timely motion to set aside the judgment was overruled and final judgment was entered April 5, 1966. Upon application to this Court an appeal and supersedeas were granted November 14, 1966, to the judgment of April 5, 1966. The case was submitted for decision upon arguments and briefs on the April Special 1967 Docket of this Court.

The facts in this case are highly conflicting. The plaintiff contends one thing with regard to the contract of the sale of coal and the defendant contends another. Both rely on the Uniform Commercial Code which was enacted into law by the legislature of this State in 1963 and consists of Chapter 46 of the Code of West Virginia at the present time. This is one of the first cases presented to this Court involving the provisions of the Uniform Commercial Code, and particularly that portion which deals with the three usual types of warranty occurring in sales under the Code, namely, express, merchantability, and fitness for a particular purpose.

Sylvia was operating a coal mine in Preston County in August, 1964, under the supervision of Albert Phillips. Mercury was operating a coke production plant in Preston County and was owned principally by Wayne H. Fortney. The Mercury Coke operation had been operated by Mr. Fortney for some time and he was experienced in the production of coke from coal largely purchased by him from Preston County pro-

ducers. The Sylvia mine had just been recently opened and Mr. Fortney, who had known Mr. Phillips for about 15 years, visited the Sylvia operation about August 16, 1964, at which time he stated he called on Mr. Phillips to discuss obtaining the services of Mr. Phillips to reopen the Morgan coal mine which was partly owned by Mr. Fortney and had been closed by reason of a fire. The first coal taken from the Sylvia mine had been dumped in two large piles near the mouth of the mine. Mr. Phillips admits having some previous discussion with Mr. Fortney with regard to the reopening of the Morgan mine and also some discussion after his visit to the Sylvia operation, but does not recall any detailed discussion with regard to the Morgan mine at the time the controversy over the purchase of the coal in question in this case is involved.

Mr. Phillips stated that when he came out of the mine Mr. Fortney was looking at the coal piles and inquired about a purchase of that coal. Mr. Fortney stated that they first discussed the problem of the Morgan mine and that then one or the other of them discussed the purchase of the coal located in the coal pile near where they were standing. Mr. Phillips testified that when Mr. Fortney inquired about the coal contained in the coal pile that he told him it was a substandard quality and contained considerable slate and rock. He said that Mr. Fortney told him he was making a cheap grade of coke and would pay $2.25 to $2.50 a ton for that coal and nothing was said about the ash content. No analysis had been made of the ash content of the coal piles located near the opening of the Sylvia coal mine. However, an analysis had been made of coal taken from another part of the Sylvia mine which showed about 9 or 10% ash which Mr. Phillips stated that he told Mr. Fortney about and showed him the analysis. It was suggested either by Mr. Phillips or Mr. Fortney at that time that if the coal located in the coal piles was run through a tipple to clean it, that would improve the quality and Mr.

Fortney said he could use it if that was done. There was a tipple about two miles from the Sylvia coal mine and at the direction of Mr. Phillips, in accordance with the agreement with Mr. Fortney, 1546.24 tons of coal from the coal pile at the Sylvia mine were hauled to the tipple nearby and run through the tipple and about 127 tons of rock and slate were picked out of the tonnage from the picking table when it was run through the tipple leaving 1419.35 tons of coal which was delivered to the coke yard of Mercury on August 17th and 18th. The cost to Sylvia in the hauling and cleaning of the coal was $1588.09.

On August 18th Mr. Fortney came to the Sylvia mine and told Mr. Phillips to stop loading any more coal from the coal pile until an analysis was made of the coal. However, at that time Mr. Fortney, after looking at the same coal pile, again ordered three more truck loads and personally directed the highlift operator how, when and where to obtain the coal from the coal piles.

Several days later Mr. Phillips went to Mercury coke plant where Mr. Fortney advised him that an analysis of the coal showed that it was about 33.8 to 35.6% ash and showed him a sample of the coal which he had unsuccessfully endeavored to make coke from. Mr. Fortney then told Mr. Phillips in effect that he did not want the coal that had been delivered and that if Phillips could sell it he would load it free of charge. It was Mr. Phillips' contention that the coal in question was purchased by Mr. Fortney and he was not interested in the further disposition of it. Mr. Phillips had never been engaged in the producing of coke in his experience in the mining of coal and had never been engaged in the sale of coal for any purpose and although he knew very little about the making of coke, he stated he would not consider coal with 35% ash content suitable for making coke. Witnesses who were engaged in the purchase and sale of coal and who testified in behalf of Mercury stated that it was the

custom of the coal business for unacceptable coal to be rejected at the point of destination because the buyer as a general rule does not see the coal until it is delivered and has no opportunity to ascertain if it was what he ordered until it is delivered. The defendant also introduced evidence that coal with over 30% ash was not suitable for coking purposes and that good quality coal for coking purposes sells for around $4.50 to $7.00 a ton and that the most suitable coal is around 8 to 10% ash for coke. It was also indicated that the prior inspection of the coal before it was delivered would have some bearing on the right to reject the coal.

Mr. Fortney's testimony was in conflict with that of Mr. Phillips in many instances. He testified that he used coal with up to 16% ash to produce coke for which he paid $2.25 to $3.00 a ton and that he had paid up to $7.00 a ton for coal with 8% ash to produce good coke. He testified that he told Mr. Phillips that he would pay $2.25 for 16% ash content, $2.50 for 14% ash content and $2.75 for 12% ash content and that he asked what the analysis of the coal being opened up was, that Phillips showed him a bag and said it was a sample, and that it was around 9½% ash. Fortney interpreted this as applying to the piles, as that was the only coal out of the mines. He also said he told Phillips that he would not buy coal that was over 16% ash and that Phillips stated that he would deliver coal not over 16% ash content for $2.50 a ton.

There is very little conflict in their statements with regard to the cleaning and delivering of the coal. Fortney said he visited the tipple on August 18th where the coal was being cleaned and that he was not satisfied with the way the rock and slate were being picked from the coal and asked that the tipple be slowed down so that they could get more of the rock and slate out but was advised that it had been slowed down as much as possible. He asserted that after he visited the tipple where the coal was being cleaned he asked

Phillips not to send any more until he got an analysis back. He stated that Phillips suggested that there were three or four more trucks to load and he told him to go ahead and load and deliver them and admitted that he personally directed the highlift man where to place the shovel in the coal to load the trucks. He said that he agreed to take the additional truck loads of coal in order to keep the truck drivers from losing work.

At the conclusion of the plaintiff's evidence and at the conclusion of all the evidence the defendant moved for a directed verdict on the ground that the evidence clearly showed that there was an express warranty and an implied warranty of merchantability and of fitness for the particular use for which the coal was sold and that there was no evidence that the breach of these warranties had been waived. These motions were overruled. After the entry of judgment on the verdict a motion was again made under Rule 50, R.C.P. for a judgment in favor of the defendant or in the alternative under Rule 59, R.C.P. for a new trial, all of which were overruled.

Several errors are relied on for reversal, which in their essentials are: (1) The plaintiff did not prove any agreed price for the coal, (2) there was no evidence to support the verdict of the jury in the amount of $1,000, (3) the uncontradicted evidence established the existence of implied warranties of merchantability and of fitness for a particular purpose and an express warranty, breaches of which were not waived, (4) that the motions for a directed verdict and to set aside the verdict and judgment and enter judgment for the defendant or grant a new trial should have been sustained, (5) that instruction 2 of the plaintiff which was given by the court was improper, and (6) that the evidence with regard to the cost of cleaning and delivering the coal was improper.

The contention of the defendant that the evidence establishing express and implied warranties is uncon-

tradicted is without merit, as the record clearly shows that these matters were vigorously in dispute. The evidence of the plaintiff indicates that there was neither an express nor implied warranty while the evidence of the defendant indicates that there were both an express and one or more implied warranties. At the pre-trial conference an agreed statement of facts by the parties contained in an order entered by the trial court on November 15, 1965, clearly shows that the evidence was in direct conflict, that the evidence of plaintiff would be that the coal was purchased without any warranty, express or implied, and that the defendant would contend that there was an express warranty with regard to the ash content and implied warranty with regard to the merchantability of the coal. The express warranty relied on by the defendant is that the plaintiff warranted the coal to be less than 16% ash. The plaintiff specifically denies that any such warranty was made and asserts that the coal was bought by the defendant after an inspection of the coal and that the defendant's buyer saw and knew what he was getting, and not only that, but in addition after more than 1400 tons had been delivered he ordered more of the same coal. Also, the plaintiff contends he agreed to take the coal after it was cleaned and the rock and slate picked from it.

It has always been true, both before the adoption of the Uniform Commercial Code and after its adoption, that where there is a conflict in the evidence with regard to whether an express or implied warranty exists the question is one for the jury to determine as to whether or not such warranty exists in the sale of the goods or product. 46 Am. Jur., Sales, §348; 67 A.L.R.2d 619, 626; *Kemble v. Wiltison,* 92 W.Va. 32, 38, 114 S.E. 369; *Kirk v. Stineway Drug Store Co.,* 38 Ill. App. 2d, 415, 187 N.E. 2d 307; *De Graff v. Myers Food Inc.,* Bucks County (Penn.) 19 D.&C. 2d 19, 2 Bender's Uniform Commercial Code Service, Reporter Digest 2-185, Sec. 2-315. See Official Comment 1,

Michie's West Virginia Code 46-2-315; Official Comment 5, Michie's West Virginia Code 46-2-316.

The contention of defendant that the plaintiff did not prove the price for which the coal was to be sold is also without merit. The evidence of the plaintiff indicated that the price would be about $2.50 and that is what he contended should be paid for the sale of the coal, and even if there had been no price fixed under the Uniform Commercial Code the buyer can be held to pay a reasonable price. Code, 46-2-305, as amended; *Kuss Machine Tool N Die Co. v. El-Tronics, Inc.*, 393 Pa. 353, 143 A. 2d 38.

The contention of the defendant that the verdict of the jury in the amount of $1000 is not supported by any evidence and for this reason should be set aside, is not well taken. The plaintiff could have complained because the verdict and judgment were not sufficient in accordance with the evidence introduced by it during the trial of the case but if it is willing to accept a lesser amount than that indicated by the evidence the defendant can not complain. This principle is adequately covered in syllabus 1 of the case of *Blair-Parke Coal and Coke Company v. Fiedler-Davis Fuel Company*, 98 W. Va. 374, 127 S. E. 61, wherein it was held: "Where, in a suit in assumpsit, the verdict is for plaintiff in an amount less than he is entitled to recover, such verdict will not be set aside and a new trial awarded for that reason alone, on defendant's motion, if the plaintiff is willing to accept the verdict of the jury."

The contention that the coal in question in the stock pile or coal pile was sold by sample of some coal that the plaintiff had analyzed is disputed by the evidence of the plaintiff because Mr. Phillips stated that the sample was taken from good coal mined from the mine and analyzed as 9 or 10% ash content, and he asserts that he clearly stated to Mr. Fortney that the coal in the stock pile was substandard coal and that the sample and statements made as to it were not in any way made a part of the basis of the contract to purchase the coal

as an express warranty under Code, 46-2-313, 1(a) and (c), as amended. In any event this question, as well as the question of the express warranty that the coal in the stock pile was less than 16% ash is a question for jury determination. See Official Comment 3, Michie's West Virginia Code 46-2-313. This matter is clearly covered in the first syllabus of the case of *American Canning Co. v. Flat Top Grocery Co.*, 68 W. Va. 698, 70 S. E. 756, in the following language: ''The fact that a sample is exhibited does not necessarily make the transaction a sale by sample. The contract must evince intention to contract by sample.''

There is no question in this case but that the defendant inspected the coal in question before it was cleaned and delivered which could exclude an express warranty if he relied upon his examination rather than affirmations, descriptions and samples, and which could exclude implied warranties covering patent defects which his buyer's skill ought to have disclosed to him, and the question of what effect his examination had is, with conflicting evidence or evidence which may be interpreted more than one way, a jury question Likewise, there can be no sale by description under Code, 46-2-314, as amended, where the buyer selected the coal as was done in the case at bar. 3 Bender's Uniform Commercial Code, §7.01 [3] [a] ; *Torpey v. Red Owl Stores,* 228 F. 2d 117.

Another matter for jury consideration with regard to the existence of an implied warranty in connection with the quality intended is the price to be paid for the coal in question. The evidence of both the plaintiff and the defendant is uncontradicted that the price was from $2.25 to $2.50 a ton, which is lower than the standard price for coal to be used for coking purposes. The price of such coal from the evidence is around $5.00. Therefore, the jury could consider this matter in connection with the obligation under the contract for the sale and purchase of the coal. See Official Comment 7, Michie's West Virginia Code 46-2-314, which

points out that the nature and scope of an implied warranty of merchantability, which is a concept relating to overall quality rather than fitness for a particular purpose, are excellently outlined by consideration of the selling price.

The implied warranty of fitness for a particular purpose under Code, 46-2-315, as amended, does not come into being unless the buyer relies on the seller's skill or judgment in connection with the matter or goods purchased. The evidence in this case clearly shows that Mr. Phillips had no experience in the sale of coal to make coke or for any other purpose and his experience was only in the production of coal and that Mr. Fortney was experienced and skilled in the purchase of coal, especially for his coke company, and he in no way relied on the judgment of the seller in the selection of the coal involved in the case at bar. Furthermore, Mr. Phillips, the seller, was not a merchant for the sale of coal and in such case the implied warranty of fitness for a particular purpose is not ordinarily applicable. See Official Comment 4, Michie's West Virginia Code 46-2-315.

The evidence of the plaintiff, if believed, indicates that there was no implied warranty of merchantability in connection with the contract for the sale of the coal. Mr. Phillips asserts that he told Mr. Fortney that the coal which was sold to him was substandard quality, and Mr. Fortney examined the coal and agreed to have it cleaned of rock and slate and delivered without analysis. Later he stated that he wanted the delivery stopped until an analysis could be made but immediately agreed to the purchase and delivery of more of the coal which contained the same ash content. Under these circumstances this would tend to prove the exclusion of implied warranties as allowed by Code, 46-2-316, 3(a) and (b), as amended.

All of the evidence detailed herein makes this case one for jury determination as to whether or not the coal in question was sold with or without express or

implied warranty. The jury having found for the plaintiff that under the evidence there was no express or implied warranty and having been properly instructed, we find no reversible error in the disposition of this case by the trial court.

It is contended by the defendant that instruction number 2 of the plaintiff, which was the only instruction given in behalf of the plaintiff and which was amended by the court, is reversible error. It is contended that it is a binding instruction, but this is not correct. It states instead that the jury *may* find for the plaintiff, which makes it a permissive instruction and allows the jury to find under the evidence whether there were express or implied warranties that would prohibit the plaintiff from recovery if breached. *Walker v. Robinson,* 141 W. Va. 563, 91 S. E. 2d 468; *Davis v. Fire Creek Fuel Co.,* 144 W. Va. 537, 109 S. E. 2d 144. Although this instruction did not define in detail the elements of express and implied warranties, the instructions of defendant that were given did instruct the jury with regard to the details of implied and express warranties and what each consisted of and fully supplemented instruction number 2 of the plaintiff in connection with this matter. *Hesson v. Penn Furniture Co.,* 70 W. Va. 141, 73 S. E. 302; *Lawrence v. Nelson,* 145 W. Va. 134, 147, 113 S. E. 2d 241. We find no error in the instructions given to the jury and its disposition of the case.

For the reasons stated herein the judgment of the Circuit Court of Preston County is affirmed.

*Affirmed.*