JONES, INC., *a corporation*

*v.*

W. A. WIEDEBUSCH PLUMBING AND HEATING CO.,

*a corporation*

*v.*

EMSWELLER INCORPORATED, *a corporation*

*and* NORRIS INDUSTRIES, *a corporation*

(No. 13297)

Submitted October 2, 1973.    Decided December 11, 1973.

258

*Furbee, Amos, Webb & Critchfield, Alfred J. Lemley and Kenneth R. Miller* for Wiedebusch.

*Herschel Rose, Duane Southern, James D. Nash, Jr., Greene, Ketchum & Baker,* for Jones.

*McWhorter, McNeer & Highland, W. Paul McWhorter* for Emsweller Inc.

SPROUSE, JUSTICE:

This is an appeal from the final judgment of the Circuit Court of Marion County in an action instituted by the plaintiff, Jones, Inc., against the defendant, W. A. Wiedebusch Plumbing and Heating Co., for damages due to an alleged breach of warranty in supplying and installing sprinkler heads in the sprinkler system of the plaintiff's building. After installation, one of the sprinkler heads inexplicably released a large amount of water, causing damage to the plaintiff's merchandise and stock in trade. The amount of the damages was stipulated as $9,148.87.

The defendant filed a third party complaint against Emsweller, Inc., the supplier and installation subcontractor, and Norris Industries, the manufacturer. Emsweller as a third party defendant, filed a crossclaim against Norris. The case in its totality was submitted to

the jury and a verdict in favor of the defendant Wiedebusch was returned. On April 15, 1972, the circuit court entered judgment upon the jury verdict and dismissed the claims of Wiedebusch against Emsweller and Norris.

On April 18, 1972, upon a motion of the plaintiff pursuant to the Rules of Civil Procedure, the circuit court set aside the judgment and granted the plaintiff a new trial. By that same order, the circuit court directed that the claims of Wiedebusch against Emsweller and Norris be reinstated. Those two ancillary third party cases are the subject of a companion case, appeal number 13298, and are not further considered in this opinion.

The building in which the plaintiff operated a department store in Fairmont, West Virginia, contained a sprinkler system, which had been installed in 1929 and was designed to operate in the event of fire. The heads on the system were geared to discharge water when the temperature reached 165° Fahrenheit for some heads, and for others when the temperature reached 212° Fahrenheit. The plaintiff, in January, 1967, upon the recommendation of the West Virginia Rating Bureau, decided to replace all of the sprinkler heads within the system. Consequently, the plaintiff inventoried the number of the heads and their location within the store.

In the fall of 1968, the plaintiff entered into an oral agreement with Wiedebusch to replace all of the sprinkler heads. The terms of the agreement were negotiated by Richard D. Garrison, Secretary, Treasurer and Comptroller of Jones, Inc., and Robert C. Tonry, President of W. A. Wiedebusch Plumbing and Heating Company.

Conflicting evidence was introduced at the trial concerning what descriptive information was provided by the plaintiff to the defendant for the installation and replacement of the sprinkler heads. Garrison testified that a copy of the 1967 inventory which indicated only the number of heads and the location was supplied to

Wiedebusch, emphasizing that this was all the information furnished. Tonry, the Wiedebusch executive, testified that he remembered receiving no such list and instead was advised orally by another Jones employee of the number of sprinkler heads needed and the temperature rating for each head. The Jones employee denied this. In other words, the plaintiff contends that it only informed the defendant of the number of heads needed, but the defendant contends that in addition to this, it was advised as to the temperature rating for each head. There is no contention that any other information in this connection was discussed.

It is admitted that the parties entered into an agreement whereby Wiedebusch was to supply the sprinkler heads and perform the necessary work. Aside from the conflicting testimony concerning the information supplied about the temperature ratings of each head, there is no conflict in the testimony concerning the parties' intentions and reliance at the time the agreement was reached. Garrison who negotiated the agreement for Jones was asked:

"Q. Did you or any of your people have any experience or expertise in the field of sprinkler systems?

"A. No.

"Q. Or any training as such?

"A. None.

"Q. If anything needed to be done, with whom or with what company or particular outfit did you contact to do such work?

"A. We would look for a company qualified to do this rather specialized work."

He was also asked:

"Q. Mr. Garrison, what, if any, reliance did Jones place upon whatever skill and judgment of W. A. Wiedebusch in furnishing these heads?

"A. We were relying upon his company totally
because of the specialized nature of the
transaction.

"Q. You relied upon their skill and judgment
in furnishing the heads as the proper heads
and in installing them?

"A. That's right."

In this connection, Robert C. Tonry, President of
Wiedebusch, testified that his company previously had
been engaged in the business of installing sprinkler heads
and still maintained small amounts of sprinkler heads in
stock. He stated that the last work of this type that his
company had performed was in a building which is now
part of the plaintiff's store.

The following questions and answers on cross-
examination of Mr. Tonry support the plaintiff's version
of this aspect of their relationship:

"Q. * * * isn't it a fact that your company W. A.
Wiedebusch Plumbing & Heating held them-
selves out in some manner or form that they
could do the work required at the Jones store
with respect to ordering and replacing the
sprinkler heads?

"A. Yes.

"Q. In fact your company often did this type of
work up to and including October, 1968, isn't
that right?

"A. That's right.

*      *      *

"Q. In fact you had every intention of performing
the work yourself when Jones went into the
agreement with you, isn't that right?

"A. That's right.

"Q. They ordered the heads through you and
contracted with you to install them, isn't that
true?

"A. There was no contract.

"Q. Whatever agreement there was, you understood that for a price Jones would pay you and you would do the installation, isn't that right?

"A. Right.

"Q. And didn't you know that Jones was relying upon you to provide the heads and to do or provide the installation?

"A. That was the intention.

"Q. And isn't it also true, Mr. Tonry, that you or your company knew of the purpose for which the heads were intended, why the heads were to be installed?

"A. That's right.

"Q. You knew that they wanted you to furnish them with the heads which were intended to do the job which they were supposed to do, didn't you?

"A. That's right."

At the time of the agreement, Wiedebusch intended to perform the necessary work involved in the replacement of the sprinkler heads. However, because it was no longer licensed nor equipped with sufficient number of experienced personnel, Wiedebusch was unable to undertake the work requested. Wiedebusch, therefore, hired Emsweller as subcontractor for the actual installation; Emsweller ordering the sprinkler heads from Norris. The sprinkler heads were shipped directly by Norris to Wiedebusch.

No personnel of Emsweller were carried on the Wiedebusch payrolls. Mr. Tonry of Wiedebusch visited the job site every day, but his function was merely to see if the men were working. Emsweller billed Wiedebusch for the cost of the sprinkler heads and the labor charges, and Wiedebusch in turn billed Jones, Inc.

No attempt was made by either Emsweller or Wiedebusch to check the temperature ratings within the system, and no request for such service was made by

the plaintiff. According to Raymond Emsweller, it was not a project requiring the services of a sprinkler engineer. No inspection was made after the project was completed in October, 1968. Wiedebusch did not attempt to instruct or advise the plaintiff in the operation, use and maintenance of the system.

Three months after the replacement of the heads was completed, on January 9, 1968, one of the sprinkler heads "let go and there was a vast discharge of water". As a result of the discharge, water was released causing the damage.

No explanation for this occurrence was adduced at the trial. The testimony indicated that the temperature condition and the other physical circumstances relating to the installation and maintenance of the sprinkler heads had been and remained unchanged since at least 1958. Raymond Emsweller, President of Emsweller, Incorporated, testified that the sprinkler head which malfunctioned was a 165° Fahrenheit rated head, which he considered proper for the location. The head was replaced, following this incident, by Emsweller with another 165° rated head which apparently has since functioned properly. No inspection of the particular sprinkler was made, and it was not introduced in evidence.

The question before the Court simply stated is whether the trial court was correct in setting aside the verdict rendered by the jury. The action of a trial court in setting aside a verdict in favor of the defendant while entitled to peculiar weight on appeal, will be reversed when a consideration of the whole evidence shows clearly a proper case for jury determination. *Flinn v. Henthorne,* 114 W.Va. 807, pt. 1 Syl., 173 S.E. 882. See *Western Auto Supply Company v. Dillard,* 153 W.Va. 678, 172 S.E.2d 388; *Levine v. Peoples Broadcasting Corp.,* 149 W.Va. 256, 140 S.E.2d 438; *Ware v. Hays,* 119 W.Va. 585, 195 S.E. 265. However, if the evidence in no way supports the verdict of a jury, it must be set aside. *Lightner v. Lightner,* 146

W.Va. 1024, 124 S.E.2d 355; *Campbell v. Campbell,* 146 W.Va. 1002, 124 S.E.2d 345.

There was no written opinion by the trial court and the reasons for setting aside the verdict are not indicated in the record. The record does disclose that certain instructions given by the trial court were confusing and might of themselves have constituted error. The only errors assigned by the parties and treated in their briefs, however, relate to the issue of a breach of implied warranty for fitness of purpose. We would note, however, that while the plaintiff's theory of the case relates only to a breach of implied warranty of fitness, the jury was also instructed, by Wiedebusch Instruction No. 4, on the theory of implied warranty of merchantability.

West Virginia Code, 1931, Chapter 46, Article 2, Section 314, as amended, states in pertinent part as follows: "(1) * * * a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * * " The section lists several qualities required by the warranty of merchantability, including that the goods "are fit for the ordinary purposes for which such goods are used".

The next section, Code, 1931, 46-2-315, as amended, provides as follows:

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section * * * an implied warranty that the goods shall be fit for such purpose."

Text writers have been critical of courts which fail to make accurate distinction between the two implied warranties although some cases would reach the same results regardless of which warranty was applied. 6B BENDER, UNIFORM COMMERCIAL CODE SERVICE § 2-298

(1973). See 1 ANDERSON, UNIFORM COMMERCIAL CODE, 2d, § 2-106:6 at 236 (Supp.) (1970). Under the Uniform Sales Act, the courts tended to blur the two theories of implied warranty. Thus, when the Uniform Commercial Code was promulgated, draftsmen attempted to distinguish the implied warranty of fitness for a particular purpose and the implied warranty of merchantability. UNIFORM COMMERCIAL CODE CO-ORDINATOR ANNOTATED 55-56 (1963).

Lorensen in one of his articles on the Uniform Commercial Code points out the distinctions between the two implied warranties as follows:

> "* * * warranty of merchantability, is based on a policy which has gained wide, though not universal acceptance, *viz.*, when purchasing goods from a merchant who deals in goods of the kind sold, the buyer may assume that the goods are of merchantable quality or generally fit for the ordinary purposes for which such goods are used. The section dealing with fitness for a particular purpose requires something more than a mere sale by a merchant to be shown to establish an implied warranty. Under this latter section, the emphasis shifts to an actual reliance upon the skill and knowledge of the merchant.
>
> *        *        *
>
> "It should be noted that this implied warranty, unlike the one dealt with in the preceding section [merchantability], is *not* limited to merchants. * * * it can arise as to non-merchants where this is justified by the particular circumstances."
> Lorensen, *The Uniform Commercial Code Sales Article,* 64 W. VA. L. REV. 142, 161-68.

See also 1 ANDERSON, UNIFORM COMMERCIAL CODE, 2d, § 2-315:13 at 662 (1970). As has been noted, the two warranties are not mutually exclusive and may co-exist, 1 ANDERSON, UNIFORM COMMERCIAL CODE, 2d, § 2-315:6 at 659 (1970).

As stated, the parties in this case choose to treat their dispute solely as one relating to an implied warranty for fitness of purpose. Therefore, the plaintiff's burden is to establish that warranty by a preponderance of the evidence.

Each of the three elements of the warranty for fitness of purpose must be thus proved. The elements are: (1) The seller at the time of the contracting had reason to know the particular purpose for which the goods were required; (2) the reliance by the plaintiff as buyer upon the skill or judgment of the seller to select suitable goods; and (3) that the goods were unfit for the particular purpose. West Virginia Code, 1931, Chapter 46, Article 2, Section 315, as amended; *Garner v. S. & S. Livestock Dealers, Inc.*, 248 So. 2d 783 (Miss. 1971). Plaintiff must, of course, prove by a preponderance of the evidence that it was damaged as a result of any breach, but since this issue was not before the jury, it is not considered. If evidence on either of the three elements of implied warranty for fitness of purpose presents a question for the jury, the verdict should not have been set aside.

That Wiedebusch had knowledge of the particular purpose for which the sprinkler heads were required is apparent. Mr. Tonry, the President of Wiedebusch, during his brief appearance on the stand, was asked:

"Q. And isn't it also true, Mr. Tonry, that you or your company knew of the purpose for which the heads were intended, why the heads were to be installed?

"A. That's right.

"Q. You knew they wanted you to furnish them with the heads which were intended to do the job which they were supposed to do, didn't you?

"A. That's right."

The Official Comment on Section 2-315: of the UNIFORM COMMERCIAL CODE states, among other things, as follows:

" * * * Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose

intended or that the reliance exists. The buyer, of course, must actually be relying on the seller."

Wiedebusch had formerly engaged in the business of supplying and installing sprinkler heads, and in fact, had worked on the very building involved. Obviously Wiedebusch knew the purpose for which the sprinkler heads were intended. The very nature of the sprinkler heads indicates not only to a company experienced in the business, but to any layman, that the sprinklers should discharge water in case of a fire and remain safe from such discharge until such emergency. See *Kirk v. Stineway Drug Store Company*, 38 Ill. App. 2d 415, 187 N.E.2d 307.

A resort to rules of interpretive law, however, is not necessary for the simple reason that Wiedebusch admitted knowledge of the particular purpose for which the sprinkler heads were required.

The second element delineated by the evidence concerns the information supplied by Jones, the buyer, to Wiedebusch, the seller, and presents the only question of any material conflict of testimony. The following rule of law emphasizes the importance of weighing the materiality of that conflict in the resolution of this case:

> "A buyer does not rely upon the seller's judgment, skill, or experience where an article, although intended for a disclosed purpose, is to be made or manufactured or furnished by the seller in accordance with plans and specifications furnished by the purchaser; there is in such case no implied warranty that the article, if in accordance with the specifications, will answer the intended purpose, or in other words, no warranty against unfitness arising out of defects in the plans and specifications." 1 ANDERSON, UNIFORM COMMERCIAL CODE, 2d, 666 (1970).

Two witnesses for Jones testified that the only information provided Wiedebusch was the actual number of the sprinkler heads together with their locations. The President of Wiedebusch, however, testified that he did

not remember seeing the written inventory list testified to by the plaintiff's witnesses, rather that he received oral information from one of the witnesses and that this information included not only the number of sprinkler heads but the temperature rating for each sprinkler head.

It is elementary, of course, that upon a motion to set aside the verdict of the jury, "every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true". *Walker v. Monongahela Power Company,* 147 W.Va. 825, pt. 3 syl., 131 S.E.2d 736. See *Yeager v. Stevenson,* 155 W.Va. 16, pt. 2 syl., 180 S.E.2d 214. We must assume then that Tonry's testimony was correct and that he received information from the Jones representatives, both as to the number of sprinkler heads and the temperature rating for each head.

This information was provided orally by an employee of the company and can hardly be interpreted as being plans and specifications. Wiedebusch was well aware of the specialized nature of the goods sold because he had sold them and installed them over a period of years. As a matter of fact, Wiedebusch had previously installed sprinkler heads in the very building involved. In addition to that, Tonry, the Wiedebusch President, agreed with the Jones executive that Jones had relied completely and entirely upon the skill and judgment of Wiedebusch in that Jones was aware of this reliance. It is clear from this cumulative evidence that not only did the limited amount of information supplied by Jones to Wiedebusch not comprise plans and specifications for this technical installation, but that the plaintiff, as buyer, relied completely upon the skill and judgment of the seller to select suitable goods.

It is true that where evidence is conflicting concerning the existence of an implied warranty, the determination is properly for the jury. The principle is equally

applicable to the elements of warranty, including reliance by the buyer upon the seller's skill and judgment. *Sylvia Coal Company, Inc. v. Mercury Coal & Coke Company,* 151 W.Va. 818, 156 S.E.2d 1.

A comparison of the facts in this case with those of the *Sylvia Coal* case demonstrates the proper application of the rule. In *Sylvia,* there was evidence that the seller knew nothing about the technical aspects of the use of coal for coke and that the buyer not only did not rely on this skill, but possessed more technical knowledge than the seller. This was obviously a proper case for jury determination. In the instant case, not only did Jones' representative testify that he had no skill or knowledge and relied on the skill and knowledge of Wiedebusch, but Wiedebusch confirmed this evidence by his testimony. Consequently, there was no issue before the jury on this question since the defendant admitted the plaintiff's reliance.

The third element entails a determination of whether the goods were unfit for the particular purpose for which they were sold. The plaintiff was not required to exclude every possible cause for the malfunctioning of the sprinkler head, but could establish the existence of the defective condition by circumstantial evidence. *Klein v. Continental Emsco Company,* 310 F. Supp. 413 (D.C.E.D. Tex.); *VanZee v. Bayview Hardware Store,* 268 Cal. App. 2d 351, 74 Cal. Rptr. 21; *Benavides v. Stop & Shop, Inc.,* 346 Mass. 154, 190 N.E.2d 894; *Codling v. Paglia,* 38 A.D.2d 154, 327 N.Y.S.2d 978; *Hunter v. Ford Motor Co.,* 37 A.D.2d 335, 325 N.Y.S.2d 469.

Neither the plaintiff nor the defendant produced the sprinkler head during the trial of the case, nor was there any evidence of an examination of the defective head after it malfunctioned. There is, therefore, no direct evidence concerning the specific cause of the malfunctioning. There is overwhelming circumstantial evidence, however, that the malfunctioning was caused by a defect of some sort within the sprinkler head itself. The

discharge of water occurred within three months of the installation. The ceiling temperature and other physical factors relating to the working of the sprinkler system had not changed in this specific location involved since at least 1958. A sprinkler head of its same type and temperature rating had been installed at that location for a number of years. After the discharge, the sprinkler head was replaced with another of the same rating, and this was operating satisfactorily at the time of the trial. There was no evidence of any fire or heat or any type of accident that would have activated the sprinkler head. It was demonstrated at the trial that none of the employees of the plaintiff had anything at all to do with the sprinkler system and were not aware of any problem with the particular sprinkler head or any other part of the system. Plaintiff obviously established that the sprinkler head was unfit by this great bulk of completely uncontradicted circumstantial evidence.

In view of the above, it is obvious that there was no conflict of testimony as to any material fact before the jury, and the trial court was correct in setting aside the verdict on this ground.

The plaintiff below assigned as cross-error the refusal of the trial court to direct a verdict for the plaintiff at the conclusion of all of the evidence or to enter judgment for the defendant after the verdict had been set aside.

This Court has said: "It is the peculiar province of the jury to weigh the evidence and to resolve questions of fact when the evidence regarding them is conflicting, and this province of the jury should not be invaded or disturbed by the court." *Davis v. Pugh,* 133 W.Va. 569, 578, 57 S.E.2d 9, 14. It also has been held that: " * * * [A] jury question is presented even though the evidence is undisputed, if the evidence is such that reasonable men may draw different conclusions therefrom." *Evans v. Farmer,* 148 W.Va. 142, 156, 133 S.E.2d 710, 718. However, when the evidence, though conflicting as a whole, embraces uncontradicted facts and circumstances which

cause the case to turn in favor of one of the parties, so that a verdict adverse to such party cannot stand, the court should direct a verdict in his favor. *McCoy v. Cohen,* 149 W.Va. 197, pt. 5 syl., 140 S.E.2d 427; *Campbell v. Campbell,* 146 W.Va. 1002, pt. 5 syl., 124 S.E.2d 345.

Where material facts are undisputed and only one inference will be drawn from them by reasonable minds, the court should direct a verdict. On a motion for a directed verdict, the court should be guided by the same considerations as on a motion made to set aside the verdict. *Truman v. Fidelity & Casualty Company of New York,* 146 W.Va. 707, 123 S.E.2d 59; *Blain v. Woods,* 145 W.Va. 297, pt. 8 syl., 115 S.E.2d 88. See also point five of the syllabus in *Sommerville v. The Pennsylvania Railroad Co.,* 151 W.Va. 709, 155 S.E.2d 865, which states: "Where the evidence given on behalf of the defendant is clearly insufficient to support a verdict for him so that such verdict, if returned by a jury, must be set aside, and the evidence of the plaintiff is clear and convincing, it is the duty of the trial court, when so requested, to direct a verdict for the plaintiff."

The rules announced in the various decisions governing the directing of a verdict do not synthesize into a neat, syllogistic pattern. They are at best general rules which do not provide a specific formula, rather they provide broad guidelines by which the evidence must invariably be reviewed both by trial courts and appellate courts.

However, reviewing the evidence in this case, guided by these established rules, we are compelled to hold that a judgment should have been directed for the plaintiff.

In view of the overwhelming and uncontradicted evidence in the plaintiff's favor, the trial court erred in failing to enter judgment for the plaintiff upon its motion pursuant to Rule 50 (b), Rules of Civil Procedure. To the extent, however, that the order of the circuit court set aside the judgment of March 28, 1972, the action of the circuit court is affirmed.

For reasons stated in this opinion, the judgment of the Circuit Court of Marion County is affirmed in part; reversed in part; and the case is remanded with directions to enter judgment for the plaintiff.

The rights of the parties in the third party actions are treated in the opinion of the companion appeal, Case No. 13298.

*Affirmed in part;*
*reversed in part;*
*remanded with directions.*