**KOPPER GLO FUEL, INC.**

v.

**ISLAND LAKE COAL COMPANY and Forest R. Jackson.**

**Civ. No. 3–76–379.**

United States District Court, E. D. Tennessee, N. D.

May 31, 1977.

Fuels, Inc. is a corporation engaged in the business of selling coal that is mined in Claiborne County, Tennessee. Defendant Island Lake Coal Company is a corporation engaged in the business of coal brokering, and defendant Forest Jackson is the sole officer, shareholder and salesman of the corporation. The case was tried without a jury. The following findings of fact and conclusions of law are entered pursuant to Rule 52(a), F.R.C.P.

In September of 1975 Forest Jackson visited plaintiff's place of business to discuss the possibility of purchasing coal from plaintiff. He represented to plaintiff that he had made agreements with various divisions of the General Motors Corporation to supply coal, and was looking for a supply source. The parties discussed the quality of plaintiff's coal, and an oral agreement was reached to the effect that plaintiff would sell coal to Island Lake as orders were placed. Sales began in November of 1975 and continued through the following May.

Plaintiff has sued defendants for the price under UCC § 2–709. Defendants have denied liability. Defendant Jackson contends that the agreement was solely between plaintiff and defendant Island Lake Coal Company, and that he is not personally liable for any alleged liability of the corporation. Island Lake has filed a counterclaim for $137,212.50 in which it contends that a significant quantity of the coal shipped to the various divisions of General Motors was of an inferior quality because it contained excessive ash, sulfur and slate. Island Lake contends that, as a proximate result of the defective shipments, it lost its coal contracts with its customers and is entitled to consequential damages. Island Lake's theories of recovery on the counterclaim are: breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose and fraud in inducement.

Although the terms of the agreement are in dispute, it is clear from the evidence that the ordering, shipping and payment proce-

William H. Goddard, Dandridge, Tenn., Shannon D. Faulkner, III, Knoxville, Tenn., for plaintiff.

William P. Newkirk, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This case involves the alleged breach of a coal sales agreement. Plaintiff Kopper Glo

dures employed by the parties operated in the following manner. When a division of General Motors placed an order for coal, Jackson would telephone plaintiff and ask if the order could be filled. Following each telephone order, Island Lake would issue a purchase order confirming the telephone order and mail it to plaintiff. Each purchase order listed coal specifications, including sulfur content, ash content and BTU's. Plaintiff shipped every order placed by Island Lake, and Island Lake's customers accepted every shipment and burned the coal as fuel.

The customer would make payments directly to Island Lake, which would then deduct a commission ranging from five to six percent of the sales price, and forward the remaining balance to plaintiff. Island Lake was paid in full for all shipments made by plaintiff, but has not paid plaintiff the amount of $59,572.42 due and owing for coal shipped under the agreement.

■ Inasmuch as Island Lake has been paid in full for all coal shipped by Kopper Glo, Kopper Glo is entitled to recover the amount claimed, $59,572.42, unless it is determined that Island Lake is entitled to an offset by virtue of its counterclaim. The first issue to be resolved in this regard is what did the parties agree to with respect to the quality of coal to be shipped under the agreement.

The facts material to this issue are sharply in dispute. Island Lake contends that Kopper Glo agreed to deliver coal that met General Motor's specifications for a period of one year. Kopper Glo denies that such an agreement existed, and contends that it merely agreed to deliver the best coal it had available to Island Lake's customers if and when an order was placed by Island Lake. Kopper Glo admits that it was looking to a long-term business relationship with Island Lake, but asserts that all shipments were made on a "trial basis" with the hope that Island Lake's customers would be satisfied with the quality of coal it was able to supply.

Island Lake contends that Kopper Glo expressly warranted that its coal would meet General Motor's specifications. Express warranties were created under UCC § 2–313, according to Island Lake, because Kopper Glo: (1) showed Jackson coal samples and laboratory analyses that met the specifications during the course of their negotiations, (2) made affirmations of fact to the effect that its coal reserves met the specifications, and (3) shipped coal pursuant to purchase orders which listed the specifications.

Kopper Glo denies that it made an express warranty, and contends that the samples and laboratory analyses where shown solely to illustrate the quality of coal that had been mined in the past. It asserts that it is difficult, if not impossible, to predict the quality of unmined coal, and any statements made to Jackson did not purport to represent that all coal mined in the future would be identical to that mined in the past. Kopper Glo contends that Jackson, who has an M.D. and a degree in chemical engineering, was provided with this information so that he could make his own judgment on the quality of Kopper Glo's reserves. As to the purchase orders, it is apparently Kopper Glo's position that they are merely written confirmations of the oral agreement, and, as such, cannot materially alter the terms of the oral agreement.

Island Lake further contends that Kopper Glo breached an implied warranty of merchantability under UCC § 2–314 and an implied warranty of fitness for a particular purpose under UCC § 2–315.[1] Kopper Glo denies that such warranties were created or breached.

As to all claims of breach of warranty, Kopper Glo contends that the notice requirement of UCC § 2–607(3)(a) was not satisfied by Island Lake.

■ Having considered the sharply conflicting evidence, the Court is of the opinion, and finds, that Kopper Glo agreed only

---

1. As previously indicated, Island Lake also proceeds on a theory of fraud. There is no evidence supporting this claim, and it will not be further addressed herein.

to furnish the best coal it had available. The preponderance of the evidence shows that this was done. It is true, as defendants contend, that the purchase orders issued by Island Lake specified, among other things, the ash, sulfur and slate content of the coal it desired to obtain for its customers. By their own terms, these forms merely confirmed oral orders placed by Jackson over the telephone. Under certain circumstances a seller's acquiescence to the terms of a purchase order operates to make those terms part of an oral agreement. *See* UCC § 2–207. When merchants are involved, however, such terms cannot become part of the agreement when, as here, they materially alter it. *Id.* (2)(b).

 Whether an express warranty was created by the coal samples and laboratory analyses presents a close question about which there is much disagreement. The exhibition of a sample does not necessarily create an express warranty; the agreement must evidence an intention to contract by sample. *Sylvia Coal Co., Inc. v. Mercury Coal & Coke Co.,* 151 W.Va. 818, 156 S.E.2d 1, 4 U.C.C.Rep.Serv. 650 (1967). The preponderance of the evidence shows that the samples and laboratory analyses were provided solely for what they were worth to Jackson, who was a highly educated man well-versed in the chemistry of coal. Plaintiff did not represent that all coal mined in the future to fill Island Lake's needs would conform to the sample or analyses because the quality of coal varies significantly within a given mine. The Court finds that, under these circumstances, no express warranty was created by the samples or analyses.

 As to the alleged breach of implied warranty, the Court finds that the coal shipped by Kopper Glo was fit for the ordinary purpose for which it was used. All coal shipped by Kopper Glo was burned as fuel by Island Lake's customers. Since Kopper Glo agreed only to ship the best coal it had available, the coal otherwise conformed with UCC § 2–314 by meeting the contract description, being within the variations permitted by the agreement, being of fair and average quality within the description agreed upon, and being of even kind, quality and quantity within the variations permitted by the agreement.

 Whether an implied warranty of fitness for a particular purpose was created under UCC § 2–315 turns upon whether Kopper Glo knew that Island Lake was relying on Kopper Glo's skill and judgment to furnish appropriate coal, and whether Island Lake, in fact, relied on such skill or judgment. Although it cannot be disputed that Kopper Glo knew the particular purpose for which Island Lake was ordering the coal, Jackson, as previously indicated, was quite knowledgeable of coal. He personally inspected Kopper Glo's coal and was quite capable of making his own independent judgment of whether Kopper Glo's reserves would be of sufficient quality to meet Island Lake's needs. Under these circumstances, the Court is of the opinion that an implied warranty of fitness for a particular purpose was not created. *Cf. Sylvia Coal Co., Inc. v. Mercury Coal & Coke Co., supra.*

The Court further finds that, even if it is assumed that express or implied warranties were created and breached by plaintiff, Island Lake would not be entitled to recover on the counterclaim because: (1) it failed to give adequate notice of breach under UCC § 2–607, and (2) such breach was not the proximate cause of the type of damages Island Lake claims to have sustained.

### Notice of Breach

A buyer who accepts nonconforming goods must notify the seller that the goods are nonconforming "or be barred from any remedy." Section 2–607(3)(a) of the UCC provides:

"Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."

What constitutes sufficient notice is explained in Comment 4:

"The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

The courts are not in agreement with respect to what is necessary to satisfy the notice requirement. Some courts have liberally interpreted Comment 4 to mean that almost any timely notice of dissatisfaction is sufficient. See *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974); *J. White & R. Summers, Uniform Commercial Code* 347–48 (1972). Other courts have held that the requirement is more demanding, particularly when the transaction involved is of a continuing nature and is between merchants. In *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957 (1976), the Fifth Circuit Court of Appeals observed:

"[T]he fact that the Code has eliminated the technical rigors of the notice requirement under the Uniform Sales Act does not require the conclusion that any expression of discontent by a buyer always satisfies section 2–607. As Comment 4 indicates, a buyer's conduct under section 2–607 must satisfy the Code's standard of commercial good faith. Thus, while the buyer must inform the seller that the transaction is 'still troublesome,' Comment 4 also requires that the notification 'be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way to normal settlement through negotiation.' " *Id.* at 976.

*Eastern Airlines* teaches that, insofar as written notices are concerned, merchants are held to a greater standard of notice than ordinary consumers not familiar with business practices. At a minimum it must be apparent from a written notice that the buyer, in fact, is claiming breach of the particular contract involved. *Id.* at 976–77.

In addition, it is necessary to consider written notices together with the buyer's entire course of conduct, particularly when, as here, there is a continuing relationship. And such conduct must be evaluated under the standard of commercial good faith:

"[A] buyer's good faith is the governing criterion under section 2–607. As we have seen, the Code's draftsmen disposed of rigid technical requirements which would frustrate the notice requirement's design of defeating commercial bad faith. Therefore, the fact that dissatisfaction may once have been communicated to the seller should not preclude an inquiry into the buyer's good faith as evidenced by his entire course of conduct. See *United States v. Crawford*, supra, 443 F.2d [611] at 614. Even though adequate notice may have been given at one point in the transaction, subsequent actions by the buyer may have dissipated its effect. The buyer's conduct, then, taken as a whole, must constitute timely notification that the transaction is claimed to involve a breach." *Id.* at 977–78 (footnotes omitted).

Many factors are relevant to the question of commercial good faith, but of particular importance is evidence showing that the buyer continued to negotiate contracts after the alleged breach occurred, and that the buyer made no attempt to settle his claim during the time period in question. *Id.* at 978–79.

Island Lake contends that the notice requirement was satisfied by numerous oral complaints it made to Kopper Glo about the quality of the coal, and by two letters dated January 19, 1976 and February 26, 1976,

respectively. The first letter advised Kopper Glo that a laboratory report of "questionable" validity indicated that one carload of coal shipped to Fisher Body Division contained a high sulfur content. The letter added that "questionable" findings would be reviewed for validity. There was no indication at trial whether the results were re-evaluated.

The second letter advised Kopper Glo that a carload of coal shipped in December 1975 to Pontiac Motor Division contained a high ash content and a low BTU value, neither of which met purchase order specifications. The letter further indicated that Pontiac orally advised Jackson that six other carloads had excessive ash and slate contents, and that Pontiac stated in "very direct terms" that additional shipments not meeting specifications would be rejected. No shipments were subsequently rejected by Pontiac.

Kopper Glo acknowledges receipt of the above letters and admits that Jackson orally complained about the quality of the coal on several occasions. It contends, however, that it had no notice that Island Lake was claiming a breach until the counterclaim alleging an offset was filed in this Court some seven months after the parties terminated their relationship. Kopper Glo claims it was led to believe that Island Lake's customers were generally pleased with the coal they had been receiving.

The single most forceful expression of Island Lake's dissatisfaction is the letter of February 26, 1976. It complains only of shipments to one buyer, Pontiac Motor Division, and speaks only of seven carloads of coal. Yet scores of carloads of coal were shipped by Kopper Glo to other customers, including the Chevrolet Assembly Plant and the Buick Motor Division. No written complaints were made by Jackson concerning shipments to these customers.

As previously noted, the letter indicated in "very direct terms" that Pontiac would reject all future shipments not meeting specifications. But shipments continued to Pontiac for some three months after the letter was written and not a single shipment was rejected.

The preponderance of the evidence demonstrates that the oral and written complaints made by Jackson were interspersed among numerous "glowing" reports about how pleased Island Lake's customers were with Kopper Glo's coal. Jackson even reported that one plant superintendent had recommended Kopper Glo's coal to another plant superintendent, and a "trial order" was placed as a result of the recommendation. The proof showed that brokers were rarely satisfied completely with coal they received, and complaints about quality were routine in the coal industry.

The force of Jackson's complaints was substantially diminished by his repeated praise of Kopper Glo's coal. His favorable reports greatly outnumbered the complaints, and he continued to order coal throughout the period of time during which the complaints were made. Not once did a customer of Island Lake reject a shipment of coal supplied by Kopper Glo.

Shipments were made under the agreement until late May of 1975, at which time Island Lake decided to place no more orders with Kopper Glo, and Kopper Glo decided to fill no more orders for Island Lake.

Considering these circumstances together with the other evidence adduced at trial, the Court finds that Island Lake's entire course of conduct led Kopper Glo to believe that it was not considered to be in breach. Accordingly, it failed to give proper notice of breach and is barred from "any remedy."

### Proximate Cause

In addition to showing that an express or implied warranty was created and breached, and that adequate notice was given under UCC § 2–607, it is necessary for Island Lake to demonstrate that losses were sustained as a proximate result of the breach before it may prevail on its counterclaim. It is not disputed that Island Lake received full payment for every shipment of coal made by Kopper Glo. Although little proof was heard on the amount of damages

Island Lake alleges it sustained,[2] it is clear that the type of damages it seeks to recover is consequential damages under UCC § 2–715, that is, the value of the "contracts" that it lost with its customers because of Kopper Glo's alleged breach.

 The Court is of the opinion that, even if it is assumed that a warranty was created and breached, and that proper notice of breach was given, such breach was not the proximate cause of Island Lake's lost "contracts."

First, the Court is not convinced to a reasonable certainty that Island Lake would have continued to receive coal orders from General Motors[3] for a definite period of time had Kopper Glo conformed every single shipment of coal to the specifications listed in Island Lake's written purchase orders. General Motors did not have a long-term fixed obligation to order coal from Island Lake. It had no obligation to submit purchase orders to Island Lake, and each decision to order coal was based on the price and quality of coal existing on the market at the time of the buying decision.

Once a decision was made to issue a purchase order to Island Lake, General Motors was required to purchase only a portion of its requirements from Island Lake for the short-term period specified in the purchase order. Even then, each purchase order issued by General Motors was subject to cancellation "at any time deemed advisable" by General Motors. Any promise allegedly made by General Motors to continue to purchase coal from Island Lake was thus illusory.

Island Lake relies on the depositions of three General Motors employees to demonstrate that Kopper Glo's alleged breach resulted in the loss of the "contracts." William Craglow, the chief power engineer at Buick, worked with two other persons to decide from whom Buick would purchase coal. Although he first stated that Buick stopped ordering coal from Jackson because of "quality, either sulfur or ash," he later replied as follows when counsel asked him if it was true that Buick would have continued to order coal from Island Lake had quality standards been met:

> "I can't answer that. It is possible, but I can't say yes, sir."

After a brief off-the-record discussion with counsel, he agreed that his earlier statement about quality was truthful.

William Snyder works with Craglow in determining from whom Buick will buy its coal. He stated that it was "highly probable" that Buick would have continued to order coal from Island Lake had the shipments made by Kopper Glo complied with Buick's specifications. He did not state how long Buick would have continued to place orders or what quantities would have been involved.

Charles Wallace is the power superintendent at Fisher Body Corporation–GMC. He is jointly responsible with another person for the purchase of Fisher's coal. He stated that Kopper Glo sold

> "a good product most of the time, and no matter who you buy coal from it is not like buying a piece of carpeting . . . You tell your source the problems [and hope they correct them]."

He stated that he and Jackson mutually agreed that it would be better if Island Lake began shipping coal from a producer other than Kopper Glo. Wallace agreed that he ultimately told Jackson he would not be able to buy from Island Lake unless another producer were found. Island Lake then began ordering coal from Dixie Pine Coal Co. until problems developed resulting in the termination of Island Lake's business relationship with Dixie Pine.

2. At the direction of the Court, Island Lake did not submit proof on the amount of its damages. The Court stated that a separate hearing would be held on the amount of damages in the event that it was determined that Island Lake was entitled to recover on its counterclaim. Such a hearing will not be necessary in view of the holding herein.

3. As previously indicated, Island Lake did business with various divisions of General Motors. For the sake of convenience, these divisions have been referred to collectively as "General Motors" in various portions of this Memorandum.

Island Lake has not submitted the depositions of the employees of any other customer which is alleged to have cancelled its "contract" because of its dissatisfaction with the coal shipped by Kopper Glo.

The proof shows that whatever problems there were regarding the failure of the coal to meet specifications were attributable in part to Jackson's conduct. Several shipments made by Kopper Glo conformed to the specifications listed on Island Lake's purchase order, but at the same time failed to meet the customer's specifications. *Compare* Deposition Exhibits 22, 23 and 24 *with* Exhibit 19. This was so because at times Island Lake agreed to supply coal that was of a higher quality than the coal it expected to receive from Kopper Glo.

Additionally, price was an important factor in a customer's decision to purchase coal from a particular source. Island Lake and Kopper Glo agreed to sell the coal to Island Lake's customers at specified prices. Yet the proof shows that, on at least one occasion, Island Lake sold coal for $2 per ton more than the price it had agreed upon with Kopper Glo. This resulted in Island Lake's receiving a higher commission than the parties agreed upon, and made Kopper Glo's coal a less desirable purchase from the customer's standpoint.

The Court finds that Island Lake had nothing more than a hope that General Motors would continue to purchase coal from it. Whatever hope existed was diminished in part by Jackson's own conduct. Under these circumstances, the Court finds that Island Lake did not lose its so-called "contracts" as a proximate result of any alleged breach by Kopper Glo.

### Liability of Jackson

Kopper Glo contends that Jackson is personally liable for the debts of Island Lake. It asserts that the corporate veil should be pierced because Jackson personally participated in the entire transaction and is the sole shareholder, officer and salesman of Island Lake.[4]

The proof shows that Kopper Glo knew throughout the transaction that it was doing business with Island Lake Coal Co. and its corporate predecessor, ICT Supplies, Inc. All correspondence from Jackson to Kopper Glo was written on Island Lake stationery. A letter dated December 9, 1975 advised Kopper Glo to send all waybills, invoices and correspondence to Island Lake. *See* Exhibit 13.

The proof did not show that Jackson treated the corporate assets as his own or formed the corporation to perpetrate a fraud. The corporate identity remained separate and distinct throughout the transaction. The fact that Jackson was the sole shareholder, officer and salesman alone is insufficient to pierce the corporate veil. Accordingly, the Court finds that Jackson is not personally liable for the debts of Island Lake.

### Conclusion

For the foregoing reasons, it is ordered that judgment be, and the same hereby is, entered for plaintiff Kopper Glo Fuels, Inc. and against defendant Island Lake Coal Company for the sum of $59,572.42. The complaint is dismissed against defendant Forest R. Jackson individually.

It is further ordered that judgment be, and the same hereby is, entered against Island Lake Coal Company and for Kopper Glo Fuels, Inc. on the counterclaim.

Order Accordingly.

---

4. Kopper Glo moved to amend its pleadings at the end of the hearing to conform with the evidence bearing on Jackson's personal liability. The pleadings originally relied on the theory that Jackson was personally liable because he dealt with Kopper Glo throughout the entire transaction. The motion to amend is granted so as to conform the pleadings to whatever additional evidence was introduced on this issue. Rule 15(b), F.R.C.P.