Robert G. Hill

*v.*

Joseph T. Ryerson & Son, Inc.,

*Defendant*

*v.*

United States Steel Corporation,

*Third-Party Defendant*

No. 14111

Decided May 6, 1980.

Dissenting Opinion June 11, 1980.

*Charles M. Love, Jr., David Faber, Love, Wise, Robinson & Woodroe,* for appellant U.S. Steel Corp.

*Herbert G. Underwood, Steptoe & Johnson,* for Ryerson.

*Timothy J. Padden* for Babcock & Wilcox.

*Richart E. Rowe, Goodwin & Goodwin,* for Robert G. Hill.

MILLER, JUSTICE:

United States Steel Corporation [U. S. Steel] appeals an adverse judgment in the amount of $125,000 in favor of Joseph T. Ryerson & Son, Inc. [Ryerson]. The judgment was the result of a product liability action filed by Mr. Robert Hill against Ryerson in the Circuit Court of Monongalia County, in which U. S. Steel was found to have the ultimate liability for manufacturing the defective product—a steel pipe.

Hill received injuries to his left eye when a hydraulic cylinder on which he was working split under pressure. The steel cylinder was part of a large tube or pipe that Hill's employer had purchased from Ryerson, which acted as a warehouse supplier of pipe products. Ryerson was sued by Hill on the basis that it supplied defective tubing and that there was a breach of the implied warranty of fitness. Hill recovered $125,000 from Ryerson, and Ryerson impleaded U. S. Steel as a third-party defendant.

U. S. Steel asserts that the trial court committed three principal errors: that the disclaimer and limitation of remedy provision contained in U. S. Steel's acknowledgement of order form sent to Ryerson limits Ryerson's recovery; that Ryerson did not give reasonably prompt notice to U. S. Steel of the claim for injuries arising out of the defective product; and that the admission into evidence of the piece of steel tubing which bore the paint mark "RT 1419" violated the hearsay rule.

I

Both the plaintiff's complaint against Ryerson and Ryerson's third-party complaint against U. S. Steel were

framed to encompass both strict liability in tort and breach of implied warranty of fitness, and the jury was instructed as to both theories. While the case was tried prior to our decision in *Morningstar v. Black & Decker Manufacturing Co.*, ___ W.Va. ___, 253 S.E.2d 666 (1979), the trial court's instructions on strict liability in tort perceptively followed Syllabus Point 4 of *Morningstar*:

> "In this jurisdiction the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made."

The issues in the present case do not relate to the correctness of the underlying product liability law, but rather involve the question of available defenses in a third-party action where the seller of a defective product seeks indemnity from the manufacturer.

In Note 22 of *Morningstar v. Black & Decker Manufacturing Co., supra*, we acknowledged the right of implied indemnity, stating:

> "Most courts recognize that a seller who does not contribute to the defect may have an implied indemnity remedy against the manufacturer, when the seller is sued by the user. *Good v. A. B. Chance Co.*, 565 P.2d 217, 227 (Colo. App. 1977); *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 20-21, 329 N.E.2d 785, 786-87 (1975); *Kroger Co. v. Bowman*, 411 S.W.2d 339, 342-43 (Ky. 1967); *Newmark v. Gimbel's, Inc.*, 54 N.J. 585, 600, 258 A.2d 697, 705 (1969); *Smith Radio Communications, Inc. v. Challenger Equipment, Ltd.*, 270 Or. 322, 527 P.2d 711 (1974); Annot., 28 A.L.R.3d 943, 975 (1969) (Supp.)."

We have not had occasion in a product liability case to discuss the nature of the right to implied indemnity. This indemnity concept is not unique to product liability

cases. The general principle of implied indemnity arises from equitable considerations. At the heart of the doctrine is the premise that the person seeking to assert implied indemnity—the indemnitee—has been required to pay damages caused by a third party—the indemnitor. In the typical case, the indemnitee is made liable to the injured party because of some positive duty created by statute or the common law, but the actual cause of the injury was the act of the indemnitor. *United States Fidelity & Guaranty Co. v. Virginia Engineering Co.*, 213 F.2d 109 (4th Cir. 1954); *Kaplan v. Merberg Wrecking Corp.*, 152 Conn. 405, 207 A.2d 732 (1965); *Russel v. Community Hospital Ass'n*, 199 Kan. 251, 428 P.2d 783 (1967); *Mayer v. Fairlawn Jewish Center*, 38 N.J. 549, 186 A.2d 274 (1962); *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368 (1951); 41 Am. Jur. 2d *Indemnity* § 20 (1968); 42 C.J.S. *Indemnity* § 20 (1944).

While *Morningstar* dealt with the principles of strict liability in tort, in the field of product liability the right of implied indemnity is generally accorded to a seller against the manufacturer of a defective product regardless of whether the seller is found liable to the injured party under the theory of strict liability in tort or that of breach of implied warranty of fitness. In *Herman v. General Irrigation Co.*, 247 N.W.2d 472, 479 (N.D. 1976), the seller was found liable for breach of implied warranty. The court sanctioned his implied indemnity suit against the manufacturer, stating:

> "It is the general rule that a retailer or other seller suffering and paying a judgment against him by an injured person in a warranty action is entitled to indemnity from a manufacturer who sold the product to him with a similar warranty. 3 Frumer & Friedman Products Liability 44.03[1]. And in the field of products liability, the concept underlying allowance of indemnity is that the indemnitee has been rendered liable because of a nondelegable duty arising out of common or statutory law, but the actual cause of the injury has been the act of another person. 3 Frumer & Friedman, *supra*, § 44.02[2]. See *Burbage v. Boiler*

> *Engineering and Supply Co.*, 433 Pa. 319, 249 A.2d 563 (1969)."

*See also Agricultural Services Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057 (6th Cir. 1977); *Hales v. Monroe*, 544 F.2d 331 (8th Cir. 1976); *Liberty Mutual Ins. Co. v. Williams Machine & Tool Co.*, 62 Ill.2d 77, 338 N.E.2d 857 (1975); *Smith Radio Communications, Inc. v. Challenger Equipment, Ltd.*, 270 Ore. 322, 527 P.2d 711 (1974); *Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D. 1977); *Houseboating Corp. of America v. Marshall*, 553 S.W.2d 588 (Tenn. 1977). While most courts acknowledge the availability of the remedy of implied indemnity in product liability cases, an extended analysis of its scope has not been undertaken.

The remedy of implied indemnity is an independent cause of action based primarily on principles of restitution:

> "A person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in discharge of such liability." *Restatement of Restitution* § 96 (1937).[1]

This is not to say that in an action for implied indemnity there is no need to analyze the relationship between the indemnitee and indemnitor. It is this relationship *inter se*, as well as to the injured party, which must ultimately determine the right to implied indemnity and the defenses available to the indemnitor. As earlier stated, the fundamental premise for the cause of action is that the indemnitee has been subjected to a judgment which

---

[1] Leflar, in *Contribution and Indemnity Between Tortfeasors*, 81 U. of Pa. L. Rev. 130, 146 (1932), states:

"The right to indemnity may arise from a contract, as in the case of casualty insurance, or warranty of the quality of goods sold and their fitness for some proposed use...."

It is apparent, therefore, that whether the underlying cause of action by the injured plaintiff is in strict liability in tort or by way of breach of implied warranty of fitness, the defendant seller may have a right of implied indemnity against the manufacturer.

arose from injuries brought about by the action of the indemnitor. Consequently, the initial inquiry focuses on the activities of the indemnitor and the related question of whether the conduct of the indemnitee contributed to the injuries. U. S. Steel does not contest Ryerson's right to claim implied indemnity. Rather, it seeks to bar the claim by raising certain defenses to it.

## II

U. S. Steel asserts as a first defense that it was given no timely notice by Ryerson of the plaintiff Hill's claim for injuries arising out of the defective product. Under the principles of implied indemnity, however, notice to the indemnitor is not required unless the indemnitee seeks to bind the indemnitor to the original judgment. *McStain Corp. v. Elfline Plumbing & Heating, Inc.*, 38 Colo. App. 473, 558 P.2d 588 (1976); *Insurance Company of North America v. Hawkins*, 197 Neb. 126, 246 N.W.2d 878 (1976); *Oceanic Steam Navigation Co. v. Compania Transatlantica Espanola*, 144 N.Y. 663, 39 N.E. 360 (1895); 42 C.J.S. *Indemnity* § 26 (1944). This matter is treated at some length in *Illinois Central Railroad v. Blaha*, 3 Wis.2d 638, 646-47, 89 N.W.2d 197, 201-02 (1958), where the court quoted this statement from 42 C.J.S. *Indemnity* § 32a(2) (1944):

> "The omission to give notice to the indemnitor, however, does not affect the right of action against him, but simply changes the burden of proof and imposes on the indemnitee the necessity of again litigating and establishing all of the actionable facts. The indemnitor may show that the indemnitee had a good defense in the former action which he neglected to make, or that no liability existed against the indemnitee; or he may contest the validity of the judgment, as by showing that it was obtained by fraud or collusion; or he may contest the measure of damages recovered in the former action, or set up any other defenses he may have. ... [A]nd where the indemnitor, in the action against him, sets up the same defense as was set up by the indemni-

tee in the former action, in the absence of any plea of fraud, the judgment in that action is conclusive on the indemnitor."

Independent of a written notice, it is clear that an indemnitor can be bound to the indemnitee's judgment if he is brought into the original case as a third-party defendant under Rule 14 of the West Virginia Rules of Civil Procedure. In *Bluefield Sash & Door Co. v. Corte Construction Co.*, ___ W.Va. ___, 216 S.E.2d 216, 218 (1975), *overruled on other grounds*, *Haynes v. City of Nitro*, ___ W.Va.___, 240 S.E.2d 544 (1978), this Court recognized that Rule 14 is available to a defendant to "implead one [a third party] who is or may be liable to him for all or part of the plaintiff's claim." *See* 46 Am. Jur. 2d *Judgments* § 553 (1969); 59 Am. Jur. 2d *Parties* § 202 (1971). This was the method chosen by Ryerson in the present case.

These foregoing authorities make it clear that lack of notice by the indemnitee to the indemnitor concerning the injured plaintiff's claim will not defeat an implied indemnity action that is timely filed. If, however, the indemnitor has received no notice and has not been impleaded by the indemnitee into the original suit brought against the indemnitee by the plaintiff, then the indemnitor is not bound by the judgment rendered against the indemnitee in the plaintiff's action.

U. S. Steel argues that the notice requirement exists by virtue of our Uniform Commercial Code, W. Va. Code, 46-2-607(3)(a).[2] We do not believe this position is tenable. This Code section operates to foreclose a buyer who has accepted tendered goods from claiming that the goods are not in accordance with the contract if he fails to give timely notice of the reason why they breach the contract. The primary purpose of this Code provision is to

---

[2] W. Va. Code, 46-2-607(3)(a):

"Where a tender has been accepted

"(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; . . ."

prevent a buyer from accepting goods and later refusing to pay for them on the basis of an alleged breach of contract. *See, VLN Corp. v. America Office Equipment Co.,* 536 P.2d 863 (Colo. App. 1975); *Auto-Teria, Inc. v. Ahern,* 352 N.E.2d 774 (Ind. App. 1976); *Dold v. Sherow,* 220 Kan. 350, 552 P.2d 945 (1976); *Michigan Sugar Co. v. Jebavy Sorenson Orchard Co.,* 66 Mich. App. 642, 239 N.W.2d 693 (1976); *International Paper Co. v. Margrove, Inc.,* 75 Misc. 2d 763, 348 N.Y.S.2d 916 (1973); *Davis v. Pumpco, Inc.,* 519 P.2d 557 (Okla. App. 1977); *R. I. Lampus Co. v. Neville Cement Products Corp.,* 232 Pa. Super. 242, 336 A.2d 397 (1975), *aff'd,* 474 Pa. 190, 378 A.2d 288 (1977).

This Code section has little relevance to the product liability field, where the injured buyer is not seeking to rescind the sales contract and avoid paying the purchase price for the product, but is attempting to recover damages for personal injuries caused by the product. Nor is it particularly applicable where the seller has been sued by the injured buyer and the seller seeks to recover from the manufacturer of the defective product on an implied indemnity theory.[3] We believe that the notice requirement of W. Va. Code, 46-2-607(3) (a), is applicable to the ordinary commercial transaction where the buyer is seeking to avoid the contract price because the goods are not acceptable, and this Code section should not be extended into the product liability field.

It must be remembered that the field of product liability has evolved through judicial decisions. As a conse-

---

[3] W. Va. Code, 46-2-607 (5), gives implicit recognition of the binding effect of notice in an implied indemnity action where the buyer, like Ryerson here, is sued for a breach of warranty for which the seller, in this case U. S. Steel, is answerable:

"Where the buyer is sued for breach of a warranty or other obligation for which his seller is answerable over

"(a) he may give his seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he will be bound in any action against him by his buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend is he so bound."

quence, concepts of commercial law embodied in the Uniform Commercial Code cannot be transposed in all cases into the product liability field without an examination of their relevance to the underlying policies of product liability law. These fundamental policy considerations undergirding product liability are stated in Note 6 of *Kassab v. Central Soya*, 432 Pa. 217, 230 n. 6, 246 A.2d 848, 854 n. 6 (1968):

> "These policy considerations are plain: the consumer's inability to protect himself adequately from defectively manufactured goods, see *Jacob E. Decker & Sons, Inc. v. Capps*, 139 Tex. 609, 164 S. W. 2d 828 (1942); the implied assurance on the part of the seller that his goods are safe, see *State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc.*, supra note 1 [252 Iowa 1289, 110 N.W.2d 449 (1964)]; the superior risk bearing ability of the manufacturer, see *Escola v. Coca Cola Bottling Co.*, 24 Cal. 2d 453, 461, 150 P. 2d 436, 440-441 (1944) (Traynor, J., concurring). All of these reasons for the elimination of privity and the imposition of strict liability apply equally to both tort and contract actions."

In an attempt to implement these policy considerations, the courts have fashioned, under their common law powers, two basic remedies for product liability injuries—strict liability in tort and implied warranty of fitness. As we have previously noted, *Morningstar v. Black & Decker Manufacturing Co.*, ___ W.Va. ___, 253 S.E.2d 666 (1979), discussed at some length the strict liability in tort theory.

The remedy of implied warranty of fitness is generally considered to have reached its fullest expression in *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960). *Henningsen* abolished the necessity of privity of contract in an action for breach of implied warranty and determined that disclaimers of warranty are not available as a defense. It is particularly significant that *Henningsen* was decided on common law principles independent of Uniform Commercial Code considerations.

*Henningsen* has had enormous impact in the product liability field, but its ultimate significance may lie in its subsequent treatment by the New Jersey court. In *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 305 A.2d 412 (1973), the court concluded that, despite *Henningsen's* reliance on the concept of a breach of implied warranty, and notwithstanding the subsequent enactment of the Uniform Commercial Code, *Henningsen* must be read to have embodied the rule of strict liability in tort.

> "This entire suit is most certainly a consumer's action in strict liability in tort within the principles of *Henningsen* and its progeny. Our cases follow the previously discussed view of the Restatement and Dean Prosser that such causes of action represent a new concept not governed by the commercial contract thesis of the Code provisions. No advantage can be gained by pleading them in terms of breach of warranty, express or implied. When the gravamen is a defect in the article and consequential personal injury and property damages are sought, they will be taken for what they actually are, no matter how expressed. (This applies no matter against whom the action is brought). . . ." [63 N.J. at 156, 305 A.2d at 426-27].

*Henningsen's* transformation from an implied warranty case to a strict liability in tort case was completed in *Suter v. San Angelo Foundry & Machine Company*, 81 N.J. 150, 406 A.2d 140 (1979), where the court states:

> "We have heretofore described the development of the strict liability doctrine commencing with *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), and there is no need to retrace those steps. See *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 146-152, 305 A.2d 412 (1973). Historically the doctrine's underlying premise is that one engaged in the business of selling a product impliedly represents that goods which it places in the stream of commerce are free of defects, that is, they are reasonably suitable, safe and fit for the purposes for which those

goods have been sold. *Herbstman v. Eastman Kodak Co.*, 68 N.J. 1, 7, 342 A.2d 181 (1975). Implicit in the product's presence on the market is the representation that it will safely perform the functions for which it was constructed. *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 64-65, 207 A.2d 305 (1965); *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962). *Fitness and suitability are terms largely synonymous with safety. Cepeda [Cepeda v. Cumberland Engineering Co.*, 76 N.J. 152, 386 A.2d 816 (1978)] extended strict liability to include not only intended but also reasonably foreseeable uses of the product." [81 N.J. at 168, 406 A.2d at 149]. [Emphasis supplied].

What has emerged is a frank recognition that in the field of product liability, the concepts of strict liability in tort and breach of implied warranty of fitness are parallel doctrines, a point which has been made by a number of commentators.[4] By acknowledging the congruent nature of the two remedies, the problem which some courts have had in determining which theory the case rests upon is avoided. *See, e.g., Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 263, 391 P.2d 168, 172, 37 Cal. Rptr. 896, 900 (1964) (implied warranty theory; court concluded proof showed "all of the facts necessary to establish strict liability in tort" and therefore notice to manufacturer not necessary); *McCormack v. Hankscraft Co.*, 278 Minn. 322, 154 N.W.2d 488 (1967) (notice obviated by allowance of strict liability theory which was not pleaded and to which jury was not instructed).

Our development of the doctrine of implied warranty of fitness has occurred similarly to that of New Jersey. In *Burgess v. Sanitary Meat Market*, 121 W.Va. 605, 5 S.E.2d 785 (1939), we established an implied warranty of fitness, independent of any statutory provisions, that

---

[4] Reitz & Seabolt, *Warranties and Product Liability: Who Can Sue and Where?*, 46 Temple L.Q. 527 (1973); Phillips, *Notice of Breach in Sales and Strict Tort Liability Law: Should There Be a Difference?*, 47 Ind. L.J. 457 (1972); Jaeger, *Product Liability: The Constructive Warranty*, 39 Notre Dame Law 501 (1964).

"the article sold is fit for human consumption." [121 W.Va. at 609, 5 S.E.2d at 787]. In *Dawson v. Canteen Corp.*, ____ W.Va. ____, 212 S.E.2d 82 (1975), we noted that there had been some statutory erosion of the privity of contract defense in implied warranty actions by virtue of W. Va. Code, 46-2-318 and 46A-6-108, but proceeded to judicially abolish privity in *Dawson's* single syllabus point:

> "The requirement of privity of contract in an action for breach of an express or implied warranty in West Virginia is hereby abolished."

Thus, independently of any statutory provision, this Court has evolved the remedy of breach of implied warranty of fitness.

The confluence of the two remedies is further demonstrated in *Jones, Inc. v. W. A. Wiedebusch Plumbing & Heating Co.*, 157 W.Va. 257, 201 S.E.2d 248 (1973). There, we considered the scope of the implied warranty of merchantability under W. Va. Code 46-2-314, which is analogous to the judicially created remedy of implied warranty of fitness. In the first syllabus of *Jones*, we concluded that merchantability meant that "the goods purchased are generally fit for their ordinary purpose." *Jones* dealt with a malfunctioning sprinkler head which caused water damage to goods in a store. Liability was found based on the unfitness of the product, and because "the malfunctioning was caused by a defect of some sort within the sprinkler head itself." [157 W.Va. at 270, 201 S.E.2d at 256]. Thus, the concept of a defective or unfit product in *Jones*, an implied warranty case, is remarkably similar to the standard established for strict liability in tort in Syllabus Point 3 of *Morningstar*:

> "The cause of action covered by the term 'strict liability in tort' is designed to relieve the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing process and to permit proof of the defective condition of the product as the principal basis of liability."

There can be little doubt that the Uniform Commercial Code was not enacted to encompass product liability cases. Its purpose, rather, was to attempt to formulate a set of uniform rules relating to enumerated commercial transactions. We do not believe its provisions can be deemed to control the judicially created doctrine of implied warranty of fitness in the product liability field. This does not mean that in appropriate cases the Uniform Commercial Code cannot be utilized for guidance in product liability cases, particularly where express warranties or other features peculiar to the particular commercial transactions are involved.

We, therefore, conclude that W. Va. Code, 46-2-607(3) (a), relating to the requirement of notice where the goods breach the contract of sale, is not available as a defense in a product liability action for personal injuries or in a related suit for implied indemnity. Consequently, the trial court was correct in rejecting U. S. Steel's defense that it was not given timely notice.

### III

U. S. Steel's defense that the limiting language on the reverse side of its order acknowledgement form restricts Ryerson's remedy[5] must also be analyzed in the context of an action for implied indemnity. Most courts have

---

[5] The limitation of liability provision on the order acknowledgement form of U. S. Steel reads:

"Seller will replace, at the delivery point specified herein, any product furnished hereunder that is found to be defective or otherwise fails to conform to the conditions of this contract, or any warranty expressed in or implied from this contract, or, at Seller's option, Seller will repay the price paid for such product, plus any transportation charges paid by Buyer in addition to such price. Claims must be made promptly following delivery of the product to Buyer and Seller must be given a reasonable opportunity to investigate. Buyer's remedies with respect to any product furnished by Seller hereunder that is found to be defective or otherwise not in conformity with this contract, or with any warranty expressed in or implied from this contract, shall be limited exclusively to the right to replacement thereof or to repayment of the price, as above provided."

only marginally dealt with the impact of a disclaimer or limitation of remedy where the seller is seeking implied indemnity against the manufacturer.

Much of the litigation on exculpatory contract language has evolved in the context of a disclaimer or limitation of remedy being asserted against the injured plaintiff. In this situation, the courts have generally refused on several theories to enforce this type of exculpatory limitation language. If the plaintiff's cause of action is in strict liability in tort, the contractual disclaimer is found not to be applicable on the basis that the suit is in tort, and therefore contractual disclaimers are not available.[6] If the case is predicated on breach of implied warranty, the courts invalidiate the disclaimer either as being against public policy, or as unconscionable under statutes comparable to W. Va. Code, 46-2-719 (3),[7] which is a part of our Uniform Commercial Code. *McCarty v. E. J. Korvette, Inc.*, 28 Md. App. 421, 347 A.2d 253 (1975); *Hawkins Construction Co. v. Matthews Co.*, 190 Neb. 546, 209 N.W.2d 643 (1973); *Collins v. Uniroyal, Inc.*, 126 N.J. Super. 401, 315 A.2d 30 (1973), *aff'd*, 64 N.J. 260, 315 A.2d 16 (1974); *Haugen v. Ford Motor Co.*, 219 N.W.2d 462 (N.D. 1974); *Schroeder v. Fageol Motors, Inc.*, 86 Wash. 2d 256, 544 P.2d 20 (1975); Annot., 17 A.L.R.3d 1010, 1074 (1968).

Despite the fact that contractual disclaimers are not favored in product liability cases brought by the injured user, when claims involving intermediate parties in the

---

[6] *E.g., Sterner Aero AB v. Page Airmotive, Inc.*, 499 F.2d 709, 713 (10th Cir. 1974); *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 88 (Fla. 1976); *Whitaker v. Farmhand, Inc.*, 567 P.2d 916, 922 (Mont. 1977); *Elliott v. Lachance*, 109 N.H. 481, 484, 256 A.2d 153, 156 (1969); *Pearson v. Franklin Laboratories, Inc.*, 254 N.W. 2d 133, 138-39 (S.D. 1977); *Dippel v. Sciano*, 37 Wis.2d 443, 459-60, 155 N.W.2d 55, 63 (1967).

[7] W. Va. *Code* 46-2-719 (3), states:

"Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

distributive chain are brought, such contractual provisions may be considered because of the commercial expertise of the parties. There may be those instances where the retailer or wholesaler and the manufacturer have undertaken bona fide bargaining to limit liability. Thus, we cannot say that in every suit for implied indemnity by the retail seller or wholesaler against the manufacturer, consideration cannot be given to contractual disclaimers or limitations of remedies which are part of the contract for the sale of the product. However, these exculpatory provisions are subject to principles of unconscionability, which we have dealt with in past cases either under common law concepts[8] or those of the Uniform Commercial Code.

In *Board of Education v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977), we discussed the concept of unconscionability as it relates to a "bargained for" binding arbitration clause in a construction contract, and concluded in Syllabus Point 3:

> "[W]here a party alleges that the arbitration provision was unconscionable or was thrust upon him because he was unwary and taken advantage of, or that the contract was one of adhesion, the question of whether an arbitration provision was bargained for and valid is a matter of law for the court to determine by reference to the entire contract, the nature of the contracting parties, and the nature of the undertakings covered by the contract."

We considered the unconscionability provision of the Uniform Commercial Code in *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433 (1976), where the

---

[8] Our earlier cases tend to speak in terms of fraud, which was defined as that which "shock[s] the conscience and confound[s] the judgment of any man of common sense." *Billups v. Montenegro Reihms Music Co.*, 69 W. Va. 15, 16, 70 S.E. 779, 780 (1911). In *Summers v. Ort*, 112 W. Va. 129, 163 S.E. 854 (1932), the term "unconscionable" was applied to a business agreement which required one party to bear all of the business losses while the other party shared equally in the profits.

issue was the enforceability of a ten-day termination clause in a commercial agreement between an oil company and a retail gasoline dealer. We emphasized the disparate bargaining powers of the parties and placed considerable reliance on *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L. Ed. 2d 475 (1974). *Marinello* involved a similar commercial agreement, and the New Jersey court relied upon *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358 161 A.2d 69 (1960), to set unconscionability standards. Thus, in *Marinello*, unconscionability standards bearing on the enforceability of a commercial agreement were harmonized with the standards of unconscionability utilized in product liability cases.

It can be seen from the foregoing cases that our concept of unconscionability involves a consideration of a number of factors, including the relative bargaining strength of the parties and whether the particular provision asserted as unconscionable was a bargained-for provision in the contract, and if so, whether it was peripheral or went to the main purpose of the contract. Underlying the entire concept of unconscionability is also the concern of whether the provision offends the developed policy of the law in the area under consideration.

In the present case, the sale of pipe by U. S. Steel to Ryerson was handled in a routine fashion. There is nothing in the record to suggest that there was any advance bargaining between Ryerson and U. S. Steel as to the terms of the sale and, in particular, as to the exculpatory language. The record does not demonstrate that any price concessions were given in return for the exculpatory provision.

It does not appear that any formal contract was signed by the parties in advance of the sale, but rather that the pipe order was placed by Ryerson with U. S. Steel by a written purchase order on a printed form prepared by Ryerson. U. S. Steel subsequently acknowledged the purchase order by its order acknowledgement

form which contained certain conditions, including the exculpatory clause, on its reverse side. The initial purchase order of Ryerson contained conditions which were inconsistent with the exculpatory language contained on the U. S. Steel acknowledgement of order form.[9] This fact, when coupled with the absence of any evidence to demonstrate that there had been any bona fide bargaining over the terms and conditions of the sale, compels us to conclude that the exculpatory language asserted by U. S. Steel was not an essential part of the sale. The trial court was thus correct in denying to U. S. Steel the benefit of the exculpatory clause.

## IV

U. S. Steel urges a final ground of error, that the court permitted the introduction of hearsay, and that such hearsay was the only evidence that identified the defective pipe as having been manufactured by U. S Steel. Because of the rather fungible quality of the involved pipe, the point merits some attention. Initially, we note that the record does contain evidence independent of the claimed hearsay evidence which connects the defective pipe to U. S. Steel.

---

[9] The Ryerson purchase order, a printed form, contained a number of conditions on its reverse side, two of which were:

"3. You agree to indemnify us and our successors and assigns, against all liabilities and expenses resulting from any claim or infringement of any patent in connection with the production of goods or the performance of services hereby or the use or sale of such goods."

"12. Our inspector's receipt does not release you from liability for any errors or defects discovered after delivery. Notwithstanding any provision to the contrary in any document or writing prepared or furnished by you, acceptance by us of delivery shall not constitute assent or agreement by us to any term or condition stated by you to be applicable to the transaction covered hereby."

Ryerson did not urge in the trial below that these terms invalidated the U. S. Steel exculpatory language on the reverse side of its order acknowledgement form. It is obvious, however, that from a commercial standpoint, neither party was really bargaining as to the conditions, but merely sending to each other standard forms—commonly termed "boilerplate"—which each party had unilaterally prepared.

It was not disputed at trial that the pipe which injured the plaintiff was received by the plaintiff's employer, Superior Hydraulics, accompanied by a shipping bill from Ryerson dated October 15, 1973. The shop foreman at Superior Hydraulics testified that the pipe which injured Hill was colddrawn steel tubing, having an outside diameter of 5-1/4 inches and a wall thickness of 1/2 an inch. The pipe length was specified at random as between 17 and 24 feet and the pipe had a weight per foot of 25.379 pounds. The shipping bill was identified at trial by the shop foreman and introduced as Plaintiff's Exhibit 3.

Ryerson's evidence on identity was that it had ordered similar pipe, along with pipe of other sizes, from U. S. Steel on a purchase order dated March 21, 1973, which purchase order was introduced as an exhibit. This same type is contained on an order acknowledgement form of U. S. Steel dated April 2, 1973, which form was also introduced into evidence. The same kind of pipe is shown on U. S. Steel's load tally sheets dated May 4, 1973, which accompanied pipe delivered by U. S. Steel to Ryerson's loading dock on May 9, 1973. The pipe delivered on May 4, 1973, was to fill Ryerson's March 21, 1973, purchase order.

Ryerson's stock inventory supervisor testified from business records kept by his department that when goods are received at the loading dock entries are made in a ledger book which include the date of receipt, the vendor's name, the shipment invoice number and a receiving ticket number. The receiving ticket number is an identifying number which Ryerson maintains chronologically in its ledger book. This identifying number is placed on the vendor's load tally sheets received with the product. This receiving ticket number is also painted on the bundle of goods received. One of the purposes of this system of placing the identifying number on the vendor's tally sheets and on the goods is to enable the goods to be moved from the loading dock into the warehouse without having to inventory them on the loading dock.

Ryerson's Exhibit 13 was introduced without objection. It consisted of the tally sheets listing the various pipe delivered by U. S. Steel to Ryerson on May 9, 1973. The tally sheets showed pipe of the same size, diameter and weight as that later sold by Ryerson to Superior Hydraulics. U. S. Steel's tally sheets carried the Ryerson receiving ticket number of RT 1419.

To this point in the chain of identification, U. S. Steel makes no serious objection to the proof of identity. We are not asked to determine whether this evidence is sufficient to submit to the jury the issue of identity of the manufacturer of the pipe. There was no attempt on the part of Ryerson to show that this was the only type of pipe that it bought from U. S. Steel. The reason there was no effort to develop the evidence in this direction was that the foreman at Superior Hydraulics testified that he had saved a portion of the very pipe that injured the plaintiff and this portion was available at trial. It bore a paint mark of RT 1419, which was the same receiving ticket number shown on the U. S. Steel tally sheets which were received with the May 9, 1973, shipment.[10]

There can be little question that the invoice of U. S. Steel to Ryerson and the subsequent invoice from Ryerson to Superior Hydraulics, which served to show the characteristics of the pipe to be the same as those of the pipe which caused plaintiff's injury, were admissible as business entries or records under the "shopbook" exception to the hearsay rule. In *Tedesco v. Weirton General Hospital*, _____ W.Va. _____, 235 S.E.2d 463 (1977), we discussed in considerable detail the law in this area. The basis of the shopbook exception is that notations or entries made routinely in the regular course of business at

_____

[10] According to Superior Hydraulics' foreman, the paint mark was discovered on the pipe when the attorney and several representatives of Babcock & Wilcox appeared at Superior Hydraulics to inspect the pipe. Babcock & Wilcox had been initially sued as the manufacturer of the pipe. It was on discovery of the paint mark that Ryerson was asked the significance of the mark "RT 1419," and was able to trace the number into its ledger book.

the time of the transaction or occurrence, or within a reasonable time thereafter, are trustworthy and reliable. *See* 5 J. Wigmore, *Evidence* §§ 1420-22 (Chadbourn Rev. 1974); C. McCormick, *Evidence* Ch. 31 (2d ed. 1972); D. Binder, *The Hearsay Handbook* 69-82 (1975); Note, *Business Records Rule: Repeated Target of Legal Reform,* 36 Brooklyn L. Rev. 241 (1970).

It is not essential to the admissibility of a business record that the clerk who actually made the record be called to testify. Part of the basis of the modern business record rule is a recognition that the quantity of modern recordkeeping will often not permit the particular clerk who recorded an entry to be later identified, or, if identified, that he may not recall making the particular entry. We expressed this point in *Tedesco* as " 'commercial unavailability, that is, the entry is admissible where the commercial inconvenience in calling the witness outweighs its utility," ' quoting Nash, *The Law of Evidence, Virginia and West Virginia,* Section 150 (The Michie Co. 1954). [235 S.E.2d at 464]. *See* McCormick, *Evidence* § 312 (2d ed. 1972).

The trustworthiness of the record entry is established by the testimony of a custodial or supervisory official if he can adequately demonstrate the regularity of the particular recordkeeping as an established procedure within the business routine. *United States v. Jones,* 554 F.2d 251 (5th Cir. 1977), *cert. denied,* 434 U.S. 866, 54 L. Ed. 2d 142, 98 S.Ct. 202; *Rice v. United States,* 411 F.2d 485 (8th Cir. 1969); *United States v. Olivo,* 278 F.2d 415 (3d Cir. 1960); *Hale v. State,* 252 Ark. 1040, 483 S.W.2d 228 (1972); *People v. Kirtdoll,* 391 Mich. 370, 217 N.W.2d 37 (1974); *State v. Matousek,* 287 Minn. 344, 178 N.W.2d 604 (1970); *State v. Berns,* 502 S.W.2d 364 (Mo. 1973); *State v. Springer,* 283 N.C. 627, 197 S.E.2d 530 (1973); *Tedesco v. Weirton General Hospital,* ____ W.Va. ____, 235 S.E.2d 463 (1977). The supervisor of Ryerson's stock inventory department was a proper official to establish the recordkeeping routine and the records in Ryerson's possession were thus properly admitted.

The complexity arises with matching the portion of pipe sought to be introduced with those records. There is no question that the purely physical characteristics of the pipe—dimensions, weight, shape, substance, texture—are proper considerations in linking the pipe to the items identified in the records as having been purchased from the defendant, U. S. Steel. The problem is that the pipe bore the descriptive label "RT 1419," which matches the receiving ticket 1419 on the business record. Since the receiving ticket number identifies the delivery as having been obtained from U. S. Steel, the matching paint mark, if admissible, strongly implicates U. S. Steel as the manufacturer. It is this matching number on the pipe that is the focal point of the claim of hearsay.

It is difficult to find an enlightened discussion of a hearsay question relating to the problem of the identification of a manufacturer based on marks or labels placed on the product. Although the identity of the manufacturer is always an issue in a products liability suit, often this fact is obvious or admitted, and thus rarely litigated. *See* 63 Am. Jur. 2d *Products Liability* § 5 (1972); Annot., *Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Product Alleged to Have Caused Injury*, 51 A.L.R.3d 1344, 1349 (1973).

In those cases where the identity of the manufacturer is a litigated issue, the hearsay character of the identifying marks, labels or serial numbers is seldom discussed.[11] Product indentification markings fall within

---

[11] In *Smith v. J. C. Penney Co.*, 269 Or. 643, 525 P.2d 1299, 1301-1302 (1974), the product had been traced to the manufacturer based on labels, and while the court acknowledged a potential hearsay objection, it declined to consider the issue on the ground that it had not been properly raised at trial. *Penn v. Inferno Manufacturing Corp.*, 199 So.2d 210 (La. App. 1967), involved a sight glass in a gauge which broke and injured plaintiff. The sight glass bore the label "Inferno" and its container the label "Inferno Company." The record did not contain any evidence that the manufacturer had

the category of out-of-court statements, since they are introduced to establish the truth of the matter asserted. *See* McCormick, *Evidence* Ch. 24 (2d ed. 1972); D. Binder, *The Hearsay Handbook* 3 (1975). The reason that the hearsay question in this context is infrequently raised is that where the name of the manufacturer is cast or stamped on the product by him, this would constitute an admission that it was his mark or stamp, and would be sufficient to identify him as the maker of the product.

The paint mark in the present case is in a different category, since it was not affixed by the manufacturer. A substantial level of trustworthiness was nevertheless established by several factors.

First, the pipe with the markings remained after the accident in the possession of the plaintiff's employer, where the markings were discovered in an inspection by an attorney and officials of Babcock & Wilcox, a suspected manufacturer. Subsequent to this discovery, the marking "RT 1419" was matched to Ryerson's receiving ticket number 1419, a record with a product description that accurately coincides with the pipe in question and which thus serves to support the authenticity of the label.

Second, the pipe itself corresponds in weight, diameter, and wall thickness to the U. S. Steel pipe described in its order acknowledgement form and shipping tallies which accompanied the pipe to Ryerson.

Third, there is no evidence in the record to suggest there was an alteration or fabrication of the paint mark.[12] Finally, U. S. Steel's own examination of the pipe compelled the admission that the pipe is consistent

placed the label on the product. The court apparently assumed that it had, and found the label to identify the manufacturer without considering any hearsay question.

[12] Any such fabrication of the paint mark would have necessarily involved the foreman of Superior Hydraulics, who had custody of the pipe, the attorney and several employees of Babcock & Wilcox, who discovered the paint mark, and Ryerson itself to supply the correct number to be placed on the pipe.

with a U. S. Steel product, pointing to the conclusion that U. S. Steel manufactured the pipe.

Several criminal cases demonstrate the extent to which some courts have applied the business record exception to the hearsay rule. In *Rice v. United States*, 411 F.2d 485 (8th Cir. 1969), involving prosecution for interstate theft, the court considered the admissibility as business records of a luggage tag and corresponding claim check. The luggage tag was originally attached to a suitcase in Los Angeles by a Greyhound Bus employee. The ultimate destination of the suitcase was a city in Indiana. The court permitted a Greyhound Bus employee in St. Louis to identify the luggage tag and claim check as a part of Greyhound's regular business records and allowed them to be introduced for the purpose of establishing the fact that the suitcase had traveled in interstate commerce. Essential reliance was placed on the routine recordmaking within the regular course of business when the tag was prepared by Greyhound in Los Angeles. The person who prepared the tag did not testify and neither document was retained in the custody of Greyhound.

In *United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977), involving prosecution for violation of the Sherman Act, the court considered the admissibility as business records of documents held by one company, but prepared and shipped by another. The court found the records to be admissible despite the fact that they were not retained in the custody of the company that prepared them.

*Rice, Flom* and our own *Tedesco* opinion stand for the proposition that the key to admissibility is the regularity and trustworthiness of the business recordkeeping and entries, rather than the method of storage or retention by the maker of the records. It is significant that both *Rice* and *Flom* were criminal prosecutions where the burden of proof upon the state is substantially higher than that in a civil trial. A hearsay statement of a type that is trustworthy enough to be received by a jury

in a criminal prosecution is even more appropriately admitted in a civil case.

Consequently, we hold that where, in the course of a business enterprise, systematic recordkeeping and product labelling are routinely conducted as a part of the business methods of the enterprise, the records and product identification fall within the business record exception to the hearsay rule. An employee who is knowledgeable as to the recordkeeping and product identification process can testify to that process and thus lay the foundation for the admission into evidence of a properly marked or labelled product. The fact that the product has passed into the hands of a consumer or user will not defeat its admissibility as a business record.

The trial court here was, therefore, correct in admitting the pipe bearing the paint mark "RT 1419."

Based upon the foregoing legal principles, we find that no error was committed by the trial court, and the judgment against U. S. Steel is therefore affirmed.

*Affirmed.*

CAPLAN, JUSTICE, *dissenting:*

While I am in agreement with the majority that the paint stick mark is hearsay, I am unable to agree that the pipe with the paint stick mark is a business record and thereby comes within the exception to the hearsay rule. I believe that the pipe was improperly admitted into evidence and that without it, there was insufficient evidence to link the appellant, U. S. Steel, as the supplier of the tube.

The business record exception to the hearsay rule does not apply in this case. See generally, *Martufi v. Daniels,* 99 W.Va. 673, 129 S.E. 709 (1925); *State v. LaRue,* 98 W.Va. 677, 128 S.E. 116 (1925); *Deitz v. McVey,* 77 W.Va. 601, 87 S.E. 926 (1916); *Griffith v. American Coal Co.,* 75 W. Va. 686, 84 S.E. 621 (1915). The basis of the exception is that such entries made in the regular course of busi-

ness at the time of the act, transaction or occurrence, or within a reasonable time thereafter, are trustworthy and reliable and as such provide a substitute for the examination of the maker. See 5, Wigmore, Evidence Section 1420-22 (Chadbourne Rev. 1974). Absent this circumstantial guarantee of trustworthiness, the evidence is inadmissible.

Ryerson assigns a receiving ticket number to each shipment of goods received. Only *one* item in each bundle of goods is marked with the receiving ticket number by grease pencil or paint stick. The mark is for in-house purposes only—so the goods can be inventoried in the warehouse instead of on the loading dock—and is not indelible. The goods are stored and eventually sold and shipped out.

Here the tube in question was shipped from Ryerson to the plaintiff's employer, Superior Hydraulics, and remained in the possession of Superior Hydraulics until the institution of suit. The Babcock & Wilcox Company was initially brought into the suit by Ryerson as the supplier of the tube. Approximately nineteen months after the institution of this suit, long after the tube left Ryerson's possession, a representative of the Babcock & Wilcox Company discovered the mark on the tube and notified Ryerson. Within three days, Ryerson joined U. S. Steel as a third-party defendant. The circumstantial guarantee of trustworthiness and reliability of the business records exception is absent here. The tube with the marking was not retained within the custody or control of Ryerson. Months after the institution of suit, it appeared in the custody of another. There is no circumstantial guarantee of trustworthiness or reliability that the temporary mark placed by a Ryerson employee on one item in each bundle of goods received was so placed on the tube in question. The pipe with the marking was hearsay evidence and was improperly admitted.

Absent the introduction of the unused portion of steel tube bearing the paint stick mark "RT 1419", Ryerson did not introduce sufficient evidence to link the appel-

lant, U. S. Steel, as the supplier of the tube. The loaders who actually made the mark were identifiable, but were not called to testify. No one who testified saw the mark placed on the tube or had any personal knowledge of the circumstances under which it was made. The description and composition of the steel tubing sent to Ryerson by U. S. Steel is consistent with the description of the tube in question. However, Ryerson had several suppliers providing the exact same type of tubing. Ryerson did not produce legally sufficient evidence to identify U. S. Steel as the supplier of the tube involved. "Where the verdict of a jury is wholly without evidence on a point essential to a finding, or the evidence is plainly insufficient to warrant such finding by the jury, the same should be set aside and a new trial awarded." *Vintroux v. Simms*, 45 W.Va. 548, 31 S.E. 941 (1898)